# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| S.C., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| DIRTY WORLD, LLC, a Delaware limited | ) |
| liability company, | )    Case No:  4:11-cv-392 |
| | ) |
| and | ) |
| | ) |
| NIK RICHIE, an individual, | ) |
| | ) |
| Defendants. | ) |
| | ) |

# DEFENDANTS' SUGGESTIONS IN SUPPORT OF THEIR RENEWED MOTION FOR SUMMARY JUDGMENT

Defendants, by and through counsel, and in support of their Renewed Motion for Summary Judgment, state as follows:

ARMSTRONG TEASDALE LLP

BY: /s/ Darren K. Sharp
    Darren K. Sharp        MO #50841
    2345 Grand Boulevard, Suite 1500
    Kansas City, Missouri 64108
    816.221.3420/816.221.0786 (facsimile)
    dsharp@armstrongteasdale.com

    AND

    GINGRAS LAW OFFICE, PLLC
    David S. Gingras (admitted *pro hac vice*)
    3941 E. Chandler Blvd., #106-243
    Phoenix, AZ 85048
    Tel.: (480) 668-3623/Fax: (480) 248-3196
    DAVID@GINGRASLAW.COM

**Attorney for Defendants**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................... ii

I.   PREFATORY REMARKS ............................................................................................ 4

II.  INTRODUCTION ......................................................................................................... 6

III. STATEMENT OF UNCONTROVERTED FACTS ..................................................... 8

IV.  ARGUMENT ............................................................................................................... 12

    A.    Introductory Remarks Regarding Communications Decency
           Act ....................................................................................................................... 12

    B.    Defendants Are Immune Under The CDA From Claims Based
           On Third-Party Content ..................................................................................... 15

    C.    Defendant's Own Statements Are Non-Actionable Opinions;
           They Are Protected By The First Amendment .............................................. 19

V.   CONCLUSION ............................................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**

*Barrett v. Rosenthal*, 40 Cal.4th 33, 62–63, 51 Cal.Rptr.3d 55, 77–78, 146 P.3d 510, 529 (2006)...................................................................................................16

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003)..........................................................13

*Best Western Int'l, Inc. v. Furber*, 2008 WL 4182827, at *10 (D.Ariz., Sept. 5, 2008)........................................................................................................................19

*Brown v. Gilmore*, 278 F.3d 362 (4th Cir. 2002).......................................................15

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003)....................14, 16

*Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666 (7th Cir. 2008) ...................................................................................17

*Cornelius v. DeLuca*, 2009 WL 2568044, at *3 (E.D.Mo., Aug. 18, 2009)....................7, 14, 20

*Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008) ..................................................15

*Fair Housing Council v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008)......15, 17, 19, 22

*FCC v. Pacifica Foundation*, 438 U.S. 726 (1978) ...................................................22

*Gentry v. eBay, Inc.*, 99 Cal.App.4th 816, 833 note 11, 121 Cal.Rptr.2d 703, 717 note 11 (Cal.App. 2002) ..........................................................................................20

*Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 544 F.Supp.2d 929 (D.Ariz. 2008).................................................................................................................14, 19

*Goddard v. Google*, 2008 WL 5245490, at *3 (N.D.Cal., Dec. 17, 2008) .................6

*Goddard v. Google, Inc.*, 640 F.Supp.2d 1193 (N.D.Cal. 2009) ...............................22

*GW Equity, LLC v. Xcentric Ventures, LLC*, 2009 WL 62173, at *6 (N.D.Tex., Jan. 9, 2009)...........................................................................................................17

*Johnson v. Arden*, 614 F.3d 785 (8th Cir. 2010).............................6, 12, 14, 15, 17, 18

*M.A. v. Village Voice Media Holdings, LLC*, ___ F.Supp.2d ____, 2011 WL 3607660 (E.D.Mo., Aug. 15, 2011).................................................................4, 5, 6

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) .......................................22

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009).............14, 15

*Phan v. Pham*, 182 Cal.App.4th 323, 105 Cal.Reptr.3d 791 (Cal. App. 2010) ...................20, 21

*Shiamili v. The Real Estate Group of New York, Inc.*, ___ N.E.2d ___, 17 N.Y.3d
281, 2011 WL 2313818,at *5 (N.Y., June 14, 2011) ...................................................6

*Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710 (N.Y.Sup.,
May 24, 1995)...........................................................................................................13

*Texas v. Johnson*, 491 U.S. 397 (1989) ............................................................................21

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007) .............5, 18, 19

*Whitney Info. Network, Inc. v. Xcentric Ventures, LLC*, 2008 WL 450095, at *10
(M.D.Fla., Feb. 15, 2008) ........................................................................................17

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997).................................................13

**Statutes**

17 U.S.C. § 512, *et seq*.................................................................................................18

47 U.S.C. § 230(c)(1)..............................................................................................6, 7, 14

47 U.S.C. § 230(e)(2).....................................................................................................18

## I.     PREFATORY REMARKS

As the Court will recall, on May 24, 2011, Defendants DIRTY WORLD, LLC ("Dirty World") and NIK LAMAS-RICHIE ("Mr. Richie") filed a Motion for Summary Judgment (Doc. # 13), Suggestions In Support (Doc. #14), and an Affidavit of Mr. Richie (Doc. #14-1).  Rather than opposing this motion, Plaintiff requested a discovery continuance pursuant to Rule 56(f) (Doc. #17), which the Court granted on July 27, 2011 (Doc. #26).

Over the past several months, Plaintiff has pursued extensive discovery from Defendants, but ultimately the facts of the case remain entirely unchanged and entirely undisputed.  As such, Defendants now renew their original Motion for Summary Judgment which is incorporated *verbatim* below.

However and somewhat fortuitously, after this Court granted Plaintiff's Rule 56(f) request, a new decision interpreting the Communications Decency Act ("CDA") was issued by the U.S. District Court for the Eastern District of Missouri in *M.A. v. Village Voice Media Holdings, LLC*, ___ F.Supp.2d ___, 2011 WL 3607660 (E.D. Mo., Aug. 15, 2011).  This new decision considered and then rejected virtually the same sorts of anti-CDA arguments that Plaintiff has presented in this case; i.e., that CDA immunity can be affected by a website's decision to publish material on a non-neutral basis that the site knows may be offensive or unlawful.  Assuming this Court follows the logic applied in *Village Voice*, there is no question but that summary judgment is appropriate here.

Because Plaintiff never filed any substantive opposition to Defendants' original Motion for Summary Judgment, her position with respect to the CDA is not entirely clear.  However, in her Rule 56(f) motion, Plaintiff suggested that the CDA may not apply in this case because, according to her view of the law, "affirmative actions by website providers to create and foster a product that is mainly and knowingly used for potentially illegal purposes is enough to make a

4

determination that the website provider developed the content and deny immunity." (Doc. #18 at p. 5). In *Village Voice Media*, the district court expressly rejected exactly the same argument.

In *Village Voice*, the plaintiff was a victim of a "child sex trafficker" who used the defendant's website (www.backpage.com) to post sexually explicit advertisements using naked photos of the victim. *See Village Voice*, 2011 WL 3607660, at *1. Clearly anticipating that her claims against the website operator would be subject to the Communications Decency Act, the plaintiff presented numerous theories in an effort to avoid the CDA:

> M.A. argues that Backpage is not a service provider for purposes of § 230's immunity because, in part, (a) its website has a search engine for adult categories that allows searches of postings by key-words; (b) it "developed the value of the posted ads by working to create a highly viewed website"; (c) its website is claimed to be a "highly tuned marketing site"; (d) the website has instructions, for a fee, on how to increase the impact of the posted ads; and (e) it "offers special ad placement and re-posting for a fee."

*Village Voice*, 2011 WL 3607660, at *6. In addition to these arguments (which the court rejected), the plaintiff also made essentially the same argument that Plaintiff has made here; i.e., that because Backpage's website was *primarily* used to post unlawful content, the CDA no longer applied; "M.A. further argues that Backpage should not be immune under § 230 because it 'is aware of prior cases of minors being sexually trafficked on its website and based upon the posted ads and photography, no reasonable person could review the postings in the adult categories and deny prostitution was the object of almost each and every ad.'" *Id*. at *8 (emphasis added). The District Court correctly rejected this argument, noting, "Section 230 immunity applies even after notice of the potentially unlawful nature of the third-party content." *Id.* (quoting *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007)). Furthermore, the Court explained, "Thus, even if a service provider knows that third parties are posting illegal content, 'the service provider's failure to intervene is immunized.'" *Village Voice*,

5

2011 WL 3607660, at *8. (quoting *Goddard v. Google*, 2008 WL 5245490, at *3 (N.D.Cal., Dec. 17, 2008)).

Unless this Court chooses to reject the logic applied in *Village Voice*, it is clear that Dirty World and Mr. Richie are entitled to summary judgment. Plaintiff's argument that CDA immunity may be lost if the defendants' website "is mainly and knowingly used for potentially illegal purposes" is simply not an accurate statement of the law. Furthermore, even if Plaintiff's legal theory was correct, there is simply no evidence in this case showing that www.thedirty.com is used *primarily* for unlawful purposes. As such, the mere fact that one person may have posted something unlawful about Plaintiff does not entitle her to disregard the plain language of the law and hold Defendants responsible for material that was authored solely by a third-party. *See Shiamili v. The Real Estate Group of New York, Inc.*, ___ N.E.2d ___, 17 N.Y.3d 281, 2011 WL 2313818, at *5 (N.Y., June 14, 2011) (explaining, "Creating an open forum for third parties to post content—including negative commentary—is at the core of what section 230 protects.")

## II. INTRODUCTION

This is an action which seeks to hold a website operator liable for "publishing" material authored by a third-party. As this Court correctly determined in a previous case, this legal theory is expressly prohibited by a federal law known as the Communications Decency Act, 47 U.S.C. § 230(c)(1) (the "CDA"). *See Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010) (explaining, "The district court, following majority circuit precedent, held that [47 U.S.C.] § 230(c)(1) blocks civil liability when web hosts and other ISPs refrain from filtering or censoring the information that third parties created on their sites.") Applying the rule set forth in *Johnson* to the facts of this case leads to a simple conclusion—Plaintiff's claims against Defendants fail as a matter of law.

6

Because of the unusually high degree of legal clarity on this point, Defendants would have preferred the present motion to be brought under Rule 12(b)(6) rather than Rule 56.  As recognized in the Eighth Circuit's decision in *Johnson*, the cases interpreting the CDA are both voluminous and well-settled.  If Plaintiff's Complaint contained only those allegations for which a good faith factual and evidentiary basis existed, this case would be easily resolved under a 12(b)(6) standard.  *See, e.g. Cornelius v. DeLuca*, 2009 WL 2568044, at *3 (E.D.Mo., Aug. 18, 2009) (granting Rule 12(b)(6) dismissal in favor of website operator based on immunity conferred by 47 U.S.C. § 230(c)(1) despite plaintiff's conclusory allegation that "defendants 'conspired' with the other defendants to 'post[ ] or allow[ ] to be posted' the allegedly libel[ous] statements.")

Unfortunately, angry or overzealous plaintiffs who dislike or disagree with the CDA have decided that, Rule 11 notwithstanding, a good faith factual basis is no longer a prerequisite to an allegation in a pleading.  Instead, plaintiffs who reject the Congressional policies embodied by the CDA, but who perceive that Rule 11 as only rarely enforced, have adopted a new tactic — to try to "plead around the law" by making inflammatory factual allegations which, although completely groundless, are sufficient to state a viable claim able to withstand Rule 12(b)(6)'s low threshold.  As a result, defendants have no alternative but to resort to an early Rule 56 Motion for Summary Judgment where a Rule 12(b)(6) motion would otherwise be appropriate.

This is the case here.  As explained herein, the material facts of this case are completely undisputed.  Under those facts, Defendants are entitled to immunity under 47 U.S.C. § 230(c)(1). Plaintiff has clearly anticipated this result and has attempted to plead around it by including gratuitous conclusory allegations in her Complaint which are materially false and for which no evidence whatsoever exists.  Thus, while Plaintiff may have carefully crafted her Complaint such

7

that it might be sufficient to survive a Motion to Dismiss, summary judgment in favor of Defendants is appropriate because she has no evidence of any kind to support her allegations.

### III.   STATEMENT OF UNCONTROVERTED FACTS ("SUF")

1.     Defendant Dirty World, LLC operates a website located at www.TheDirty.com *See* Affidavit of NIK LAMAS-RICHIE ("Richie Aff.") ¶ 2.

2.     The site's founder and current editor-in-chief is Defendant NIK LAMAS-RICHIE ("Mr. Richie").  Richie Aff. ¶ 2.

3.     The site originally began in 2007 as www.DirtyScottsdale.com, which at the time was primarily about Scottsdale, Arizona.  Richie Aff. ¶ 3.

4.     When the site first began, Mr. Richie authored and posted his own comments which were often focused on lampooning "fake" (a/k/a "dirty") people living in Scottsdale colloquially referred to as "$30k millionaires."  This is a derogatory term used to refer to young people (usually males in their early 20s) who live far beyond their financial means—driving expensive cars they cannot afford and living a lavish lifestyle often funded by maxed-out credit cards.  Richie Aff. ¶ 3–5.

5.     In addition to his criticism of this lifestyle, Mr. Richie also published commentary and criticism on a wide variety of topics including, but not limited to: "beer-bong-chugging athletes, puking co-eds, drunken drivers and provocatively posing clubbers … ." Richie Aff. ¶ 5.

6.     Mr. Richie's brutally honest sense of humor struck a nerve with his viewers and the site became incredibly popular literally overnight.   Within a short period of time, www.DirtyScottsdale.com expanded nationwide, eventually growing to cover more than 50 different U.S. cities and more than 20 cities in Canada.  Richie Aff. ¶ 6.

7.     In the process, the site adopted a more geographically neutral name— www.TheDirty.com—and Mr. Richie (who initially kept his true identity a secret) gained

8

significant fame, if not infamy.  In January 2009 the Arizona Republic newspaper named Mr.

Richie one of the top ten most fascinating people of 2008, noting, "what makes him interesting is

that his site has prompted a dialogue about public and private space and about what is and is not

celebrity."  Richie Aff.  ¶¶ 7, 8.

8.     As the site has grown, its focus and format has changed.  Among other things, Mr.

Richie no longer creates every post that appears on the site.  Richie Aff.  ¶ 9.

9.     Rather, users are now permitted to "submit dirt," which can include news, photos,

video or text, and users can post their own comments about material submitted by others.  Richie

Aff. ¶ 9.

10.     Users of www.TheDirty.com may submit posts to the site on any topic

whatsoever.  Richie Aff. ¶ 10.

11.     As of May 2011, www.TheDirty.com contains more than 75,000 unique posts on

a wide variety of topics.  Richie Aff. ¶ 11.

12.     Many posts submitted to www.TheDirty.com relate to stories, news, gossip and

other forms of commentary about local individuals who are not public figures, but not all posts

are of this type.  On the contrary, in addition to posts about "non-celebrities," material appearing

on www.TheDirty.com covers an extremely broad variety of more banal topics including, but not

limited to:

       a.     President *Barack Obama*; Richie Aff. ¶ 12(a);

       b.     Donald Trump*'s presidential campaign;* Richie Aff. *¶ 12(b);*

       c.     Politicians playing solitaire; Richie Aff. ¶ 12(c);

       d.     Sports, including the 2010 World Series; Richie Aff. ¶ 12(d);

       e.     Stories involving the arrest of celebrities; Richie Aff. ¶ 12(e);

       f.     L.A. Lakers basketball player Kobe Bryant; Richie Aff. ¶ 12(f);

       g.     Falling values of U.S. dollars vs. Canadian dollars; Richie Aff. ¶ 12(g);

h. Mr. Richie himself; Richie Aff. ¶ 12(h).

13.     The submission form provided by the site is 100% content neutral; it does not ask users to post anything about any particular individual, nor does the site suggest what the author should say.  The only instructions given are as follows: "Tell us what's happening. Remember to tell us Who, What, When, Where, Why."  Richie Aff. ¶ *13.*

14.     As part of the submission process, users are asked to enter a "title" for their submission, along with basic information about the material they are submitting.  Specifically, users are asked to identify the "City," "College," and "Category" for their submission.  Richie Aff. ¶ 14.

15.     In terms of categories, the user is required to pick from a list of more than 40 different options provided by the site which include: "I HAVE NO IDEA," "Business," "News," "Spring Break" and "Would You?"  Richie Aff.  ¶ 15.

16.     This last category—"Would You?"—is generally understood to apply to requests for Mr. Richie to express an opinion as to whether he would be romantically interested in the person submitted; e.g., "Would you date this person?"  Richie Aff. ¶ 16.

17.     Such requests are not taken literally by either Mr. Richie or those who regularly visit his site.   Mr. Richie is happily married to a beautiful and famous television celebrity. Richie Aff. ¶ 17.

18.     As part of his intentionally hyperbolic satirical process, Mr. Richie responds "NO" to nearly every such submission, regardless of whether the individual submitted is an attractive celebrity, supermodel, actress, athlete, etc., or simply the girl next door.  Richie Aff. ¶ 18

10

19.     Mr. Richie responds negatively to virtually all "Would You?" submissions in order to express his view as to the absurdity and fallacy of today's perfection-seeking culture. Richie Aff. ¶ 19.

20.     Regardless of the category selected by a user for his/her submission, in most cases Mr. Richie will briefly review each new submission to ensure that inappropriate or unduly offensive material is removed such as threats of violence, profanity, racial slurs, etc.  Despite this, Mr. Richie cannot and does not "fact-check" user submissions for accuracy.  Richie Aff. ¶ 20.

21.     This case arises from a single post on www.TheDirty.com about the Plaintiff which was submitted to the site by a third-party on January 24, 2011 bearing the title "Nasty Church Girl" (the "Church Girl Post").  Complaint (Doc. # 1) ¶ 16.

22.     A true and correct copy of the Church Girl Post (excluding subsequent user comments about the post which are not at issue in this action) is attached to Mr. Richie's affidavit as **Exhibit J**.  Richie Aff. ¶ 21, Ex. J.

23.     According to the Complaint, the text of the Church Girl Post read as follows:

> "Nik, I was living in Miami Beach for 4 months for work, and this nasty bitch [Plaintiff] who was my "friend" started fcking (sic) my boyfriend in my bed and bringing her nasty ass horse teeth around my son trying to play house. This slut claims to be a sweet little church girl. She even works for the church! Fugly slut! Is this girl worth having sex with??? I wouldn't think so! LEES SUMMIT SLUT!!"

Compl. (Doc. #1) ¶ 16.

24.     Mr. Richie did not create or modify any part of the Church Girl Post or its title. The text in the body of the Post and the title was created entirely by a third-party user of www.TheDirty.com and the Post was published exactly as it was submitted to the site without

11

any changes other than an introduction which read "**THE DIRTY ARMY:**" to accurately reflect that the Post was submitted to the site by a third-party user.  Richie Aff. ¶ 22.

25.     Regular visitors to www.TheDirty.com often refer to themselves as "The Dirty Army" which is a generic term applicable to any "fans" of the website.  Richie Aff. ¶ 23.

26.     Mr. Richie does not personally know and has never knowingly spoken to the author of the Church Girl Post.  Richie Aff. ¶ 24.

27.     Mr. Richie did nothing to specifically induce the author to create the Church Girl Post about Plaintiff.  Richie Aff. ¶ 25.

28.     Mr. Richie does not know Plaintiff and prior to the commencement of this action had never heard of Plaintiff.  Richie Aff. ¶ 26.

29.     After the original post was submitted, Mr. Richie wrote a one-sentence comment about it which read in its entirety as follows: "Her gumlines [sic] as big as her teeth, that's amazing. - nik" Richie Aff. ¶ 27.

30.     Mr. Richie's comment about the Plaintiff's "gumline" was a reference to her physical appearance in a photo submitted by the author of the post.  In the photo, Plaintiff's gumline is plainly visible.  Richie Aff. ¶ 28.

**IV.     ARGUMENT**

     **A.     Introductory Remarks Regarding Communications Decency Act.**

As noted above, this Court has previously applied the Communications Decency Act (CDA) in *Johnson v. Arden* when it determined that a website host or ISP could not be held liable under any state-law theory for offensive material created by a third-party.  *See Johnson*, 614 F.3d at 792  (explaining, "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions–such as deciding whether to publish, withdraw, postpone or alter content–are barred.") (emphasis added) (quoting *Zeran v. Am. Online, Inc.*, 129

F.3d 327, 330 (4th Cir. 1997)). The same result follows here—the undisputed facts show that Defendants Dirty World and Mr. Richie did not create any defamatory or actionable material; all such material originated solely with a third-party. As such, Plaintiff's claims in this matter are completely barred by the CDA. The fact that Mr. Richie posted a non-defamatory expression of opinion about Plaintiff's appearance does not alter this result in any way.

However, because the legal issues involved in this case are somewhat counter-intuitive and because Plaintiff will likely argue for this Court to significantly change existing law, a brief overview of the CDA may be helpful. Prior to 1996, website hosts who took an active role in monitoring, editing, or removing material created or posted by third parties could be subject to liability as "publishers" of any remaining material they did *not* remove. *See generally Batzel v. Smith*, 333 F.3d 1018, 1026–27 (9th Cir. 2003) (noting, "Absent § 230, a person who published or distributed speech over the Internet could be held liable for defamation even if he or she was not the author of the defamatory text, and, indeed, at least with regard to publishers, even if unaware of the statement.") (citing *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710 (N.Y.Sup., May 24, 1995), *supersed by statute*)). On the other hand, website hosts who took no action to filter, screen, or remove offensive material were generally *not* liable for any third-party material.

Congress quickly recognized that that these rules created an unacceptable disincentive for website hosts to take a "hands off" or "ostrich" approach to content posted by users. In other words, "Without the immunity provided in Section 230(c), users and providers of interactive computer services who review material could be found liable for the statements of third parties, yet providers and users that disavow any responsibility would be free from liability." *Batzel*, 333 F.3d at 1029. In order to eliminate this concern and to encourage website operators to actively review, screen, edit and remove third-party content without fear of incurring liability, Congress

enacted the Communications Decency Act, 47 U.S.C. § 230(c)(1) which provides in relevant part:

> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

47 U.S.C. § 230(c)(1).

This law creates a "broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'" *Johnson*, 614 F.3d at 791 (citing *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009)); *see also Cornelius*, 2009 WL 2568044, at *3 (concluding that under the CDA, "a [website] provider cannot be liable for the statement of others …")

The impact of the CDA on cases arising from postings on Internet message boards such as www.TheDirty.com is very simple: "Through the CDA, 'Congress granted most Internet services immunity from liability for publishing false or defamatory material so long as the information was provided by another party.'" *Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 544 F.Supp.2d 929, 933 (D.Ariz. 2008) (emphasis added) (quoting *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122–23 (9th Cir. 2003)).  Notwithstanding the early status of this case, courts have consistently held it is appropriate to apply the CDA as soon as reasonably possible:

> Section 230 immunity, like other forms of immunity, is generally accorded effect at the first logical point in the litigation process. As we have often explained in the qualified immunity context, "immunity is an immunity from suit rather than a mere defense to liability" and "it is effectively lost if a case is erroneously permitted to go to trial."  We thus aim to resolve the question of § 230 immunity at the earliest possible stage of the case because that immunity protects websites not only from "ultimate liability," but also from "having to fight costly and protracted legal battles."

14

*Nemet Chevrolet*, 591 F.3d at 254–255 (emphasis added) (quoting *Brown v. Gilmore*, 278 F.3d 362, 366 n. 2 (4th Cir. 2002)); *see also Fair Housing Council v. Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) (en banc) (explaining, "section 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles.")

The undisputed facts demonstrate that Plaintiff's claims in this matter each seek to impose liability on Defendants for allegedly defamatory material created by a third-party. To the extent that Defendants created other non-defamatory content, the CDA surely does not apply to *that* content, but Defendants' own material is fully protected by the First Amendment. Thus, Defendants are entitled to summary judgment as to all claims.

> **B.      Defendants Are Immune Under The CDA From Claims Based On Third-Party Content.**

The material facts necessary to resolve this matter under the CDA are simple:

1.)      Defendants operate www.TheDirty.com, which is an interactive website; *see* Defendants' SUF ¶¶1, 3;

2.)      A third-party created <u>all</u> of the allegedly defamatory and/or tortious text quoted in ¶16 of Plaintiff's Complaint; *see* Defendants' SUF ¶ 21;

3.)      Defendants did not create or alter any of the text quoted in ¶ 16 of Plaintiff's Complaint; *see* Defendants' SUF ¶ 21.

Based on these undisputed facts and in keeping with the "broad" and "robust" view of immunity adopted by the Eighth Circuit in *Johnson*, Defendants are entitled to CDA immunity as to all of Plaintiff's state-law claims because those claims require treating Defendants as the "publisher or speaker" of material created by a third-party; this is precisely the type of situation where the CDA applies. *See Doe v. MySpace, Inc.*, 528 F.3d 413, 419 (5th Cir. 2008) (recognizing, "<u>Parties complaining that they were harmed by a Web site's publication of user-</u>

generated content have recourse; they may sue the third-party user who generated the content, but not the interactive computer service that enabled them to publish the content online.") (emphasis added); *see also Barrett v. Rosenthal*, 40 Cal.4th 33, 62–3, 51 Cal.Rptr.3d 55, 77–8, 146 P.3d 510, 529 (2006) (explaining, "Plaintiffs are free under section 230 to pursue the originator of a defamatory Internet publication. Any further expansion of liability must await Congressional action."); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1125 (9th Cir. 2003) (same).

Clearly aware that her claims against Dirty World and Mr. Richie are barred by the CDA, Plaintiff has attempted to plead around this result by adding the following gratuitous allegations to her Complaint:

> ¶ 12. Dirty World and Richie do not passively display third-party content. In order to post information on www.thedirty.com, Dirty World and Richie provide an interface allowing the uploading of photos, entering of comments and a variety of drop down menus allowing the choice of posting under various city, college, and categorical headings before submitting the post for publication on the site. The final post to the website is a collaborative effort between Dirty World, Richie, and third parties and Dirty World and Richie maintain control and influence over content.

> ¶ 13. Information posted to www.thedirty.com is encouraged to be derogatory and defamatory. Dirty World and Richie have designed the portal to allow the posting of defamatory material, and the set up and execution of the website's function induces defamatory material to be posted.

These allegations are completely groundless and false, but they are also largely irrelevant. Specifically, the allegations in ¶ 12 are intended to suggest that by providing a series of "drop down menus" and "categorical headings" from which authors may choose when categorizing their submissions, Mr. Richie and Dirty World become partially responsible for the material such that they are no longer immune under the CDA. This type of argument has been flatly rejected by every court to consider it. *See Carafano*, 339 F.3d at 1125 (rejecting plaintiff's argument that

website operator lost CDA immunity because it "contributes … structure and content [to third-party posts] … by asking 62 detailed questions and providing a menu of 'pre-prepared responses.'"); *Roommates*, 521 F.3d at 1169 (holding, a "website that requires users to enter their sex, race, religion and marital status through drop-down menus, and that provides means for users to search along the same lines, retains its CDA immunity insofar as it does not contribute to any alleged illegality …."); *Whitney Info. Network, Inc. v. Xcentric Ventures, LLC*, 2008 WL 450095, at *10 (M.D.Fla., Feb. 15, 2008) (finding operator of website www.RipoffReport.com was entitled to CDA immunity even though site provided users with drop-down menu for category choices from which users were required to choose when submitting content to the site); *GW Equity, LLC v. Xcentric Ventures, LLC*, 2009 WL 62173, at *6 (N.D.Tex., Jan. 9, 2009) (granting summary judgment in favor of website operator based on CDA immunity because, "Defendants' provision of a broad choice of categories from which a user must make a selection in order to submit a report is not sufficient to treat Defendants as information content providers.")   In short, none of the category choices or menu options provided to users of www.TheDirty.com is unlawful.   As such, the fact that Defendants' website provides these generic menu choices is insufficient as a matter of law to defeat the CDA.

Similarly, in addition to being factually groundless, the allegations in ¶ 13 of Plaintiff's Complaint appear to be little more than reconstructed *dicta* from the Eighth Circuit's decision in *Johnson*.   Specifically, in *Johnson*, the Court rejected the plaintiff's argument that the CDA should be construed narrowly based on the Seventh Circuit's opinion in *Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666 (7th Cir. 2008).   In passing, the *Johnson* Court noted that the Seventh Circuit's decision in *Craigslist* was not nearly as helpful as the plaintiff had suggested; "while the Seventh Circuit construes § 230(c)(1) to

permit liability for ISPs, it limited that liability to ISPs that <u>intentionally designed their systems to facilitate illegal acts, such as stealing music</u>." *Johnson*, 614 F.3d at 792 (emphasis added).

Based on that non-controversial observation,[1] the Eighth Circuit affirmed this Court's ruling that the website host in *Johnson* was entitled to CDA immunity. In reaching that conclusion, the Court explained, "The record contains no evidence that InMotion designed its website to be a portal for defamatory material or do anything to induce defamatory postings." *Id*. For that reason, the Eight Circuit agreed with this Court (through the Honorable Judge Dean Whipple) determining that dismissal based on CDA immunity was proper. *See id*.

Here, it appears that Plaintiff has interpreted this *dicta* from *Johnson* to mean that she can overcome CDA immunity by simply parroting the *reverse* of that language in ¶ 13 of her Complaint which alleges, "Dirty World and Richie have designed the portal [www.TheDirty.com] to allow the posting of defamatory material, and the set up and execution of the website's function induces defamatory material to be posted."

The problem with this allegation, among other things, is that it is simply untrue. Rather than "inducing" defamatory material to be submitted by third parties, the content submission form supplied by Defendants is 100% content-neutral; it does not ask users to post anything about any particular individual, nor does the site suggest what the author should say. The only instructions given are as follows: "Tell us what's happening. Remember to tell us Who, What, When, Where, Why*." See* SUF ¶ 10. This type of passive involvement in the creation of content is per se protected under the CDA. *See Univeral Comm. Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 420 (1st Cir. 2007) (finding CDA immunity was not defeated by plaintiff's generic

---

[1] By its own terms the CDA never applies to claims of "stealing music"; i.e., *copyright infringement*. *See* 47 U.S.C. § 230(e)(2) (explaining the CDA does not apply to <u>intellectual property</u> claims). Because that type of claim is never barred by the CDA, a website host involved in copyright infringement cannot assert immunity under the CDA. Such claims are, of course, subject to a different immunity scheme as provided by the Digital Millennium Copyright Act, 17 U.S.C. § 512, *et seq*.

allegation that defendant website operator "has involved itself with its subscriber[s'] conduct/activities and/or rendered culpable assistance to its registered subscribers to the Lycos Network, through the construct and operation of its web site … ."); *see also Best Western Int'l, Inc. v. Furber*, 2008 WL 4182827, at \*10 (D.Ariz., Sept. 5, 2008) (noting "[plaintiff] claims that the homepage [of defendant's site] impliedly suggests that visitors should make statements defaming [plaintiff]. The Court does not agree. <u>But even if this were true, it is insufficient to strip [defendant] of CDA immunity</u>.") (emphasis added) (citing *Roommates* 521 F.3d at 1173–1174).

This same result is true even if Plaintiff could show that Defendants *knowingly* "allow" third-party users to post defamatory material on their site; "It is, by now, well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech." *Lycos*, 478 F.3d at 420; *see also, Global Royalties*, 544 F.Supp.2d at 933 (explaining, "It is obvious that a website entitled Ripoff Report encourages the publication of defamatory content. However, there is no authority for the proposition that this makes the website operator responsible, in whole or in part, for the 'creation or development' of every post on the site.")

Plaintiff cannot produce any evidence to support her allegations that Defendants somehow engaged in conduct sufficient to overcome the CDA's broad immunity. As such, to the extent that Plaintiff's claims are based on the material created by a third-party as quoted in ¶ 16 of her Complaint, those claims are completely barred by the CDA, and summary judgment should be granted in favor of Defendants.

>    C.    **Defendant's Own Statements Are Non-Actionable Opinions; They Are Protected By The First Amendment.**

Defendants fully concede that the CDA does *not* apply to material which Defendants themselves created; "It is clear that, although a provider cannot be liable for the statement of

others, <u>a provider can be liable for its own words</u>." *Cornelius*, 2009 WL 2568044, at *9 (E.D.Mo., Aug. 18, 2009) (emphasis added). Of course, the mere fact that a website host creates *some* content does not mean that the host loses immunity as to *all* content. *See Gentry v. eBay, Inc.*, 99 Cal.App.4[th] 816, 833 note 11, 121 Cal.Rptr.2d 703, 717 note 11 (Cal. App. 2002) (explaining, "the fact appellants allege eBay is an information content provider is irrelevant if eBay did not itself create or develop the content for which appellants seek to hold it liable. <u>It is not inconsistent for eBay to be an interactive service provider and also an information content provider; the categories are not mutually exclusive.</u> <u>The critical issue is whether eBay acted as an information content provider with respect to the information that appellants claim is false or misleading</u>.") (emphasis added).

Here, it is an undisputed fact that Mr. Richie posted a comment in response to the third-party posting about Plaintiff. In its entirety, Mr. Richie's comment read as follows: "Her gumlines [sic] as big as her teeth, that's amazing. – nik." Defendants' SUF ¶ 28. This statement was based solely on Plaintiff's physical appearance in a photo submitted as part of the original posting.

Because Mr. Richie admits authoring this single sentence, the CDA is not implicated in any way as to that sentence. However, this does not mean that Plaintiff may overcome the CDA and impute liability to Mr. Richie for *other* material that he did not create. This is not how the CDA works. Rather, if Mr. Richie's own statement was non-actionable, then Plaintiff's claims against him cannot survive.

A helpful discussion of this aspect of the law is set forth in *Phan v. Pham*, 182 Cal.App.4[th] 323, 105 Cal.Reptr.3d 791 (Cal. App. 2010), a case arising from very similar facts. In *Phan*, the defendant received an email which allegedly defamed the plaintiff in various ways. *See Phan*, 182 Cal.App.4[th] at 325–326. The defendant forwarded the email (which he did not

write) to a third-party along with an introductory comment (which he did write). With these facts, the court framed the question as follows: "What happens when you receive a defamatory e-mail and you forward it along, but, in a message preceding the actual forwarded document, introduce it with some language of your own?" *Id.* at 325 (emphasis added). To the extent Plaintiff is attempting to impose liability on Dirty World and Mr. Richie for a third-party's statements based on Mr. Richie's comment about the size of Plaintiff's gumline, this scenario is closely analogous if not identical to the facts of *Phan*.

In arguing that the CDA should not apply, the plaintiff in *Phan* suggested that, because the defendant added his own comments to the defamatory email before passing it along, he became responsible for the entire message including the text he did not create. *See id.* The trial court rejected this argument and the California Court of Appeals affirmed, finding the defendant was entitled to CDA immunity even though he added his own original content to the third-party's email. This conclusion was based on "the rule that a defendant's own acts must *materially contribute* to the illegality of the internet message for immunity to be lost." *Id.* at 326 (emphasis in original). Because the defendant's own words were not defamatory, the Court of Appeals found the CDA applied because, "the only possible defamatory content … found in the e-mail was the original content received by defendant Pham from [the original author]. Nothing 'created' by defendant Pham was itself defamatory." *Id.* at 328. For that reason, the appellate court affirmed the application of CDA immunity. *See id.*

Applying this logic here, it is apparent that Mr. Richie's short comment about the size of Plaintiff's gumline was not itself defamatory because it was merely a non-actionable expression of opinion about Plaintiff's physical appearance. *See Texas v. Johnson*, 491 U.S. 397, 414 (1989) (holding, "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea

itself offensive or disagreeable."); *FCC v. Pacifica Foundation*, 438 U.S. 726, 745 (1978) (emphasis added); ("[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection."); *see also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 910 (1982) ("Speech does not lose its protected character ... simply because it may embarrass others or coerce them into action").

As a non-actionable expression of opinion protected under the First Amendment, Mr. Richie's comment about Plaintiff's appearance (while certainly rude) did not *materially* change the meaning of the original "Church Girl" post. In other words, assuming the statements involved were factually false, the original Church Girl post would have exactly the same harmful effect on Plaintiff <u>without</u> Mr. Richie's comment as it did <u>with</u> Mr. Richie's comment. The addition of Mr. Richie's comment therefore did not *materially* change the meaning or actionability of the original posting.

As such, because his words did not materially alter the meaning of the original author's text and because his words, even if hurtful, are not independently actionable, Mr. Richie's comment is not sufficient to defeat his immunity under the CDA as to the original Church Girl posting. *See Goddard v. Google, Inc.*, 640 F.Supp.2d 1193, 1196–1197 (N.D.Cal. 2009) (explaining "a website operator does not become liable as an 'information content provider' merely by 'augmenting the content [of online material] generally.' Rather, the website must contribute 'materially ... to its alleged unlawfulness.'") (quoting *Roommates*, 521 F.3d at 1167–1168).

**V.  CONCLUSION**

For the reasons stated herein, the Court should grant summary judgment in favor of Defendant and against Plaintiff as to all claims in this matter.

Respectfully Submitted,

ARMSTRONG TEASDALE LLP

BY: */s/ Darren K. Sharp*
      Darren K. Sharp        MO #50841
      2345 Grand Boulevard, Suite 1500
      Kansas City, Missouri 64108
      816.221.3420
      816.221.0786 (facsimile)
      dsharp@armstrongteasdale.com

AND

      GINGRAS LAW OFFICE, PLLC
      David S. Gingras (admitted *pro hac vice*)
      3941 E. Chandler Blvd., #106-243
      Phoenix, AZ 85048
      Tel.: (480) 668-3623
      Fax: (480) 248-3196
      DAVID@GINGRASLAW.COM

**ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on December 23, 2011, a copy of the foregoing was served by operation of the Court's electronic filing system upon the following:

Matthew J. O'Connor, Esq.
Bradly H. Bergman, Esq.
Mid-America Trial Lawyers
523 Grand, Suite 1B
Kansas City, MO 64106
mjoc@workingforjustice.com
bhb@workingforjustice.com
Attorneys for Plaintiff

*/s/ Darren K. Sharp*